U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

AUG - 5 2015

TONY R. MOORE, CLERK
BY _____ MB _____
                    DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| JELD-WEN, INC. | CIVIL ACTION NO. 13-03172 |
| -vs- | JUDGE DRELL |
| LAIDIG SYSTEMS, INC. | MAGISTRATE JUDGE KIRK |

### RULING AND ORDER

Before the Court is Defendant Cincinnati Insurance Company's Motion for Partial Summary Judgment. (Doc. 217). All responsive pleadings have since been filed (Docs. 219, 224), and the matter is ready for disposition. For the following reasons, the motion will be **GRANTED**.

I.  Background

This litigation arises out of the construction of four concrete storage silos. Plaintiff Jeld-Wen, Inc. ("Jeld-Wen"), contracted with Laidig Systems, Inc. ("Laidig"), for the construction of these four silos for use in its wood fiber door-facings manufacturing plant in Dodson, Louisiana. Laidig subsequently entered into a subcontract with Gateway Tank, Inc. ("Gateway") "for the design, construction and erection of the concrete silos." (Doc. 204 at 5). Gateway engaged Worline & Associates, Inc. ("Worline"), a civil/structural engineering and land surveying firm, to design the silos and Mast Lepley Storage ("Lepley") to build doors for the structures. Construction work on the silos began in January 2008 and "was completed in late 2012." (Id.). In March 2013, cracks appeared

in the wall of one of the silos. Subsequently, cracks were observed in two other silos. Although this fact is somewhat in dispute, it appears that the silos failed because of inadequate "rebar"[1] below access doors on the silo; these doors were installed by Gateway despite their deviating from the size called for by the plans. (See Docs. 222-1; 222-3). According to Jeld-Wen's Third Amended Complaint, Gateway failed to implement a permanent remedy for the damaged silos, although Jeld-Wen made the property available for investigation of the failures. (Doc. 204 at 7). Jeld-Wen subsequently brought suit against Laidig, Gateway, and various other parties to recover damages allegedly incurred because of the cracks in the silos. Following settlement agreements between Jeld-Wen and many of the defendants in this suit, the only parties against whom Jeld-Wen still has active claims are Gateway and its insurer, Cincinnati Insurance Company ("CIC"), the defendant that filed this motion. Jeld-Wen's remaining claims are for: breach of a supposed third-party beneficiary contract, negligence, breach of express warranty, breach of warranty of fitness for intended use, breach of warranty of fitness for ordinary use, unreasonably dangerous and defective construction and composition under the Louisiana Products Liability Act, breach of contract, implied contractual indemnity, unjust enrichment, equitable indemnity based upon unjust enrichment, and indemnity (the last against CIC only).

CIC's motion for partial summary judgment relates to insurance coverage under the commercial general liability ("CGL") policy it issued to Gateway. Specifically, CIC asks the court to find that any or all of Jeld-Wen's claims for damages resulting from the work

---

[1] "Rebar" is a construction term of art and is short for "reinforcement bars" for use in concrete.

2

Gateway performed on the defective silos are excluded from coverage under the terms of the CGL policy, and that CIC has no duty to indemnify Jeld-Wen or Laidig based on the terms of the same policy. Jeld-Wen has opposed the motion (Doc. 219), to which opposition CIC has replied (Doc. 224). After carefully considering the evidence and briefs of counsel, we observe the following:

## II. Law and Analysis

### A. Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). We consider all "evidence in the light most favorable to the party resisting the motion." Trevino v. Celanese Corp., 701 F.2d 397, 407 (5th Cir. 1983). However, the non-moving party does not establish a genuine dispute with "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). It is important to note that the standard for a summary judgment is two-fold: (1) there is no genuine dispute as to any material fact, *and* (2) the movant is entitled to judgment as a matter of law.

At trial, it is the insurer who bears the burden of proving that a loss falls within an exclusion in the insurance policy. Blackburn v. Nat'l Union Fire Ins. Co. of Pittsburgh, 784

3

So. 2d 637, 641 (La. 2001). Thus, when an insurer seeks to deny coverage in a summary judgment motion, it must prove that the insurance policy at issue includes an exclusion that precludes coverage. McMath Constr. Co. v. Dupuy, 897 So. 2d 677, 681 (La. App. 1 Cir. 2004), writ denied, 896 So. 2d 40 (La. 2005).

### B.  Interpretation of Insurance Contracts

In diversity cases such as this, we must apply the substantive law of the forum state, as interpreted by the state's highest court. See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co., 530 F.3d 395, 399 (5th Cir. 2008). The Louisiana Supreme Court has provided the following summary of the rules governing the interpretation of insurance policies:

> Interpretation of an insurance policy usually involves a legal question which can be resolved properly in the framework of a motion for summary judgment. An insurance policy is a contract between the parties and should be construed using the general rules of interpretation of contracts set forth in the Civil Code. The judicial responsibility in interpreting insurance contracts is to determine the parties' common intent. Words and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning.
>
> An insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. Unless a policy conflicts with statutory provisions or public policy, it may limit an insurer's liability and impose and enforce reasonable conditions upon the policy obligations the insurer contractually assumes.
>
> If after applying the other general rules of construction an ambiguity remains, the ambiguous contractual provision is to be construed against the insurer and in favor of coverage. Under this rule of strict construction, equivocal provisions seeking to narrow an insurer's obligation are strictly construed against the insurer. That strict construction principle, however, is subject to exceptions. One of these exceptions is that the strict

4

> construction rule applies only if the ambiguous policy provision is susceptible to two or more reasonable interpretations. For the rule of strict construction to apply, the insurance policy must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable.

Huggins v. Gerry Lane Enters., Inc., 957 So. 2d 127, 129 (La. 2007) (quoting Bonin v. Westport Ins. Corp., 930 So. 2d 906, 910-11 (La. 2006)).

### B.  "Your Work" Exception to Coverage for Damaged Silos

The CGL policy issued to Gateway by CIC contained a "Damage to Your Work" exclusion that reads:

> 2.  *Exclusions*
>
> *This insurance does not apply to: . . .*
>
> l.  *Damage to Your Work*
>
> *"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."*
>
> *This exclusion does not apply if the damaged work or work out of which the damages arises was performed on your behalf by a subcontractor.*

(Doc. 217-6 at 21, 25). As usual, the definitions section of the policy defines the "products-completed operations hazard" as one that "includes all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product or your work,'" but excludes those "[p]roducts that are still in your physical possession" and "[w]ork that has not yet been completed or abandoned." (Id. at 38). "Your work" is defined as: (1) Work or operations performed by you or on your behalf; and (2) Materials, parts or equipment furnished in connection with such work or operations," and includes

5

"(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work'; and (2) The providing of or failure to provide warnings or instructions." (Id. at 39). Neither party argues that there is any ambiguity in these provisions, and neither does the court note any. Therefore we only must determine whether the damaged silos fit under this exclusion. If they do, then CIC does not owe coverage to Gateway.

In Supreme Services & Specialty Co. v. Sonny Greer, Inc., the Louisiana Supreme Court interpreted similar provisions in a CGL policy. 958 So. 2d 634 (La. 2007). There, a contractor and its subcontractors poured concrete for a building's slab and parking lot that cracked because of faulty design and construction. Id. at 636. After the construction project was completed, suit was filed against the contractor, who filed a third party demand against its insurer. Id. The insurer moved for summary judgment based on a like work-product exclusion. Id. at 637. The policy in that case had a coverage exclusion for work "incorrectly performed" by the insured or its subcontractors and also excluded property damage included in a "products-completed operations hazard" ("PCOH") that was identical to the one in the CGL policy at hand. Id. at 639-40. Analyzing these exclusions, the Louisiana Supreme Court held: "Under the 'work product' exclusion, the insured or its subcontractor becomes liable for damages to its work or its product caused by its faulty workmanship. Under the PCOH provision, damages, other than the faulty product or work itself, arising out of the faulty workmanship are covered by the policy." Id. at 645. Therefore, the contractor in that case, without its insurer, remained individually liable for restoration, repair, or replacement of its and its subcontractors'

6

defective work product (the cracked concrete), and the products-completed operation hazard was inapplicable, because no damages arising out of the defective work or injury to a third party because of the defective work had been shown at all. Id.

Here, while there appears to be little evidence of any damage to property other than Gateway's work product, CIC does not ask us to decide this definitively. Instead, it asks us to find only that losses owed for the cracked silos themselves are excluded from coverage because they constitute Gateway's own defective work. (Doc. 217-1 at 8). Therefore, CIC argues, for the purposes of this ruling, the "products-completed operations hazard" is also inapplicable. As to the work product exclusion, CIC alleges in its motion that the work on the silos that caused their failure was completed solely by Gateway. Jeld-Wen counters that some of the work was completed by Worline and Lepley as subcontractors, and therefore that there is a genuine dispute of material fact as to whether the exclusion applies.[2] However, Jeld-Wen's own memorandum and evidence submitted in connection with it make clear that neither Worline nor Lepley actually performed any of the type of work on the silos that caused them to fail.

To repeat, the subcontractor exception in the CGL policy provides that the work product exclusion does not apply "if the damaged work or work out of which the damages arises was performed on your behalf by a subcontractor." (Doc. 217-6 at 25). Worline was engaged to design plans for the silos (Doc. 221-1 at 5; Deposition of Tom Worline p. 31, ll.

---

[2] Jeld-Wen also argues that there is a dispute of material fact as to whether the work on the project was completed, in which case these exclusions are inapplicable. Because we determine infra that work on the silos was complete, we do not discuss this argument in depth, but do note that even if work was ongoing, coverage for damage to the silos appears to be excluded by another exclusion in the CGL policy, this one for "Damage to Property." (Doc. 217-6 at 24).

7

11-15). Lepley only manufactured and sold the access doors to Gateway, which were taken to the work site by Gateway's truck for installation on the silos and then installed by Gateway employees. (Doc. 221-2 at 4, 7; Deposition of Dan Witzigreuter p. 66, ll. 20-22, p. 69, ll. 7-9).

Work performed by Worline is excluded from coverage under an endorsement that was added to the CGL policy at hand. The additional exclusion states, in relevant part:

> A. *This insurance does not apply to . . .*
>
>   2. *Any liability arising out of the rendering of or failure to render any professional services by you or on your behalf, but only with respect to either or both of the following operations:*
>
>     a. *Providing engineering, architectural or surveying services to others; or*
>     b. *Providing, or hiring independent professionals to provide, engineering, architectural or surveying services in connection with construction work you perform.*
>
> *Professional services include:*
>
>   a. *The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and*
>   b. *Supervisory or inspection activities performed as part of any related architectural or engineering activities.*

(Doc. 217-6 at 97). Jeld-Wen posits in its opposition that Worline provided only "engineering services and designs." (Doc. 219 at 8). In support, it provides deposition testimony from an employee of Worline, who states plainly that Worline's role in the construction of the silos was generating design plans and that they performed the "engineering" for the repair of the silos. (Doc. 222-1 at 5, 26; Deposition of Tom Worline,

8

p. 31, ll. 11-13, p. 106 l. 7). This creates no genuine dispute of material fact regarding coverage; in fact, it confirms that there is none traceable through Worline's activities. Even construing the evidence in the light most favorable to Jeld-Wen, the policy makes clear that Worline's work is excluded from coverage. It is evident that the role Worline performed was rendering of "professional services" on Gateway's behalf and thus explicitly excluded under the policy issued by CIC.

The evidence is closer as to Lepley, but nevertheless shows that work performed by the company does not fall under the subcontractor exception. Courts generally require both custom fabrication and some on-site presence in order to find that a materials supplier is a subcontractor. See, e.g., Limbach Co. V. Zurich Am. Ins. Co., 396 F.3d 358, 364-65 (4th Cir. 2005) (subcontractor status applied when a pipe company custom-manufactured the pipe and visited the work site to provide instructions for installation); Bldg. Specialties, Inc. v. Liberty Mut. Fire Ins. Co., 712 F. Supp. 2d 628 (S.D. Tex. 2010) (no subcontractor status when installation training was provided but materials were not custom-made). Here, Lepley simply manufactured and sold doors to Gateway that were then installed on the silos. (See generally Doc. 222-2, Deposition of Dan Witzigreuter). Although Lepley manufactured the doors, it was Gateway who installed them and who did this in spite of their incorrect size. And while Lepley did build the doors according to Gateway's specifications (albeit incorrectly), there is no evidence in the record of any site visit by a representative of Lepley, nor providing Gateway or any of its employees with instructions about how to install the doors. (See Doc. 224-1 at 7, 9; Deposition of Dan Witzigreuter at pp. 232, 244). Viewing the evidence in the light most favorable to the

Jeld-Wen, we find that Gateway custom-manufactured the doors, but took no part in their on-site installation or inspection. Because of this, we find the company was a mere supplier rather than a subcontractor. Therefore, any work Lepley performed does not fall under the subcontractor exception to the work product exclusion in the CGL policy.

For the foregoing reasons, we find that there is no genuine dispute of fact as to whether the subcontractor exception to the work product exclusion in this CGL policy applies. It does not. Therefore, we also find as a matter of law that CIC does not owe coverage to Gateway for damage to the silos under the work-product exclusion.

### C.  Duty To Indemnify

Notwithstanding, Jeld-Wen also argues in its Third Amended Complaint that CIC must tender payment for a defense and must indemnify Jeld-Wen and Laidig by virtue of their status as additional insureds under the CGL policy and bsed upon an assignment of those claims to Jeld-Wen by Laidig after settlement between them. (Doc. 204 at 3, 20). Although Jeld-Wen's Third Amended Complaint contains multiple claims for indemnification, that CIC only seeks summary judgment on claim ten: for "indemnity (against CIC only)". (See id. at 20).

The CGL policy in effect at the time of the silos' failure had a policy period of three years: from February 2012 to February 2015 ("The 2012 policy"). (Doc. 217-6 at 1). A previous policy, in effect from February 2009 to February 2012 ("The 2009 policy"), apparently named both Jeld-Wen and Laidig as additional insureds. (Doc. 217-1 p. 3, fn. 2; see Doc. 217-8). However, CIC illustrates that the more recent policy named Jeld-Wen only as an additional insured, and Jeld-Wen does not appear to

10

contest this. (Doc. 217-1 at 3). Neither party argues, and there is no evidence to show,[3] that the new policy is just a renewal of the old policy. Jeld-Wen argues that CIC owes indemnity to Jeld-Wen under the new policy because the project was still ongoing, and that it owes indemnity to Laidig (and thus to Jeld-Wen as Laidig's assignee) because of the existence of a "written contract between Jeld-Wen and Laidig [that] specifically requires the naming of Jeld-Wen as an additional insured throughout work on the project." (Doc. 219 at 9).

Basic rules of insurance contractual interpretation make clear that CIC has no duty to indemnify Laidig. Laidig is not named as an additional insured on any endorsement to the 2012 policy. The plain language of the policy provides for automatic additional insureds, but only those who the insured (in this case, Gateway) is "required to add as an additional insured" by reason of either "[a] written contract or agreement" or "[a]n oral agreement or contract where a certificate of insurance showing that person or organization as an additional insured has been issued." (Doc. 271-6 at 58). Jeld-Wen has submitted no evidence of a contract or agreement, oral or otherwise, that required Gateway to add Laidig as an additional insured to the second CGL policy. The only agreement Jeld-Wen submits is one that requires <u>Laidig</u> to add <u>Jeld-Wen</u> as an additional insured to any policies purchased and maintained by Laidig. (Doc. 204-3 at 9). Neither party disputes that at all relevant times Jeld-Wen was named as an additional insured on Gateway's policy with CIC. An agreement by Laidig to ensure that this took place does not somehow create additional insured

---

[3] In fact, the evidence shows two separate insurance policies. (Docs. 217-6, 217-8).

status for Laidig under that policy. Viewing the evidence in the light most favorable to Jeld-Wen, we can say that Laidig was definitely not an additional insured on the 2012 policy, which is the one that was in effect at the time of the silos' failure. Without additional insured status, there is no duty to indemnify or defend Laidig on the part of CIC. Therefore, we find as a matter of law that CIC has no duty to indemnify or defend Laidig

Neither does CIC owe Jeld-Wen indemnification for any losses stemming out of the failure of the silos, because based on the evidence in the record, work on the silos was complete in terms of the 2012 policy. As introduced above, that policy provides that additional insureds exist where the insured is "required to add [a party] as an additional insured" by reason of either "[a] written contract or agreement" or "[a]n oral agreement or contract where a certificate of insurance showing that person or organization as an additional insured has been issued." (Doc. 271-6 at 58). The policy then states that:

> (2) Only the following persons or organizations are additional insureds under this endorsement, and insurance coverage provided to such additional insureds is limited as provided herein:
> . . .
>> (f)Any person or organization with which you have agreed per Paragraph 9.a.(1) [quoted in part above] above to provide insurance, but only with respect to liability arising out of "your work" performed for that additional insured by you or on your behalf. A person or organization's status as an insured under this provision of this endorsement continues for only the period of time required by the written contract or agreement, but in no event beyond the expiration date of this Coverage Part. If there is no written contract or agreement, or if no period of time is required by the written contract or agreement, a person or

12

> organization's status as an insured under this endorsement ends when your operations for that insured are complete.

(Doc. 217-6 at 58, 60). The policy provides that "your work" is completed at the earliest of:

> (a) When all of the work called for in your contract has been completed; or
> (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site; or
> (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.
>
> Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

(Doc. 271-6 at 38-39). Jeld-Wen alleged in its Third Amended Complaint that work on the silos "was completed in late 2012" (Doc. 204 at 5). Now, however, it argues that construction on the silos was incomplete because spiral stairs and crosswalks between the structures had not been installed. (Doc. 219 at 5; Doc. 221 at 1-2). In support of this proposition, Jeld-Wen points to a purchase order between Gateway and Laidig (and submitted into evidence by CIC) dated January 4, 2012, that describes walkways and a stairway as items needed to complete the roofs of each concrete silo (Doc. 217-7 at 3-4), as well as a set of e-mails between various employees of Jeld-Wen, Laidig, and a company called either B&R Sheet Metal, Inc. (Doc. 222-6). The e-mails, which confirm that damage to the silos was first noticed in 2013, do not involve any employee of Gateway, at one point refer to a "previous" installation of a stairway, and imply that Jeld-Wen had begun to use the silos at the time of the first failure. (Doc.

13

222-6 at 9) ("JWE is working on a plan to convert #1 silo into a green fuel silo so that we can operate during repairs.") None of this evidence indicates that Gateway, the insured in question, was still working on the silos at the time of the failure. At least in part, it implies that the work was completed under the terms of the policy because the silos were being put to their intended use, which is confirmed by various deposition testimony that materials were already being stored in the silos. (Doc. 217-3 at 3; Doc 224-1 at 4). Morever, there is evidence in the record that confirms when the silos failed Gateway was called upon to <u>repair</u> them, which additionally implies the silos should be treated as completed work under the terms of the CGL policy at hand. (<u>See, e.g.</u>, Doc. 222-3 at 4-6). Jeld-Wen raises only "metaphysical doubt" as to the completion of the silos, and thus we do not find a genuine dispute of material fact. Therefore, we hold as a matter of law that CIC does not owe indemnification to Jeld-Wen under the terms of the 2012 CGL policy because work on the silos was complete.

### III. Conclusion

For the foregoing reasons, Defendant's Motion for Partial Summary Judgment (Doc. 217) is GRANTED. Claim ten of the Third Amended Complaint is **DISMISSED**, as are all claims against CIC for coverage relating to Gateway's work on the silos.

SIGNED on this 5 day of August, 2015 at Alexandria, Louisiana.

DEE D. DRELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT